UNITED STATES of America,
Plaintiff–Appellee,

v.

Cleo D. STEPHENS, Sr.,
Defendant–Appellant.

No. 94–1257.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1994.

Decided Jan. 25, 1995 *.

Rehearing Denied March 20, 1995.**

---

* This opinion was originally released in typescript.
** Although Honorable George C. Pratt, of the Second Circuit, participated in the decision of this case, Judge Pratt retired from the bench on January 31, 1995, and took no part in the consideration of the petition for rehearing.

Michael A. Thill, Asst. U.S. Atty., Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Dyer, IN, for plaintiff-appellee.

J. Michael Katz, Katz, Brenman & Angel, Merrillville, IN (argued), for defendant-appellant.

Before COFFEY, PRATT,*** and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Defendant Cleo D. Stephens, Sr. appeals his criminal conviction under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(d), and (c). On June 12, 1992, a grand jury returned a thirty-three count indictment against Stephens, a former police officer of Gary, Indiana, and seventeen other defendants who were participating in gambling activities, drug dealing, and bribery at a liquor establishment operated by Sidney Powell in Gary, Indiana. On July 14, 1993, a superseding indictment was filed against Stephens and the other defendants. Count I of the superseding indictment charged Stephens with conducting and participating, directly and indirectly, in a pattern of racketeering activity involving Sidney Powell's illegal gambling and liquor sales operation, a RICO conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d). The predicate acts upon which the RICO conspiracy charge was based included seventy-five acts of bribery between August 1989 and January 1991, in violation of Indiana Code § 35–44–1–1. Count II charged Stephens with conspiring to distribute and possess with intent to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count III charged Stephens with violating 18 U.S.C. § 1955 by conducting an illegal gambling business, and aiding and abetting the business. Stephens entered a plea of not guilty to all three counts, and a jury trial commenced on October 12, 1993. On October 25, 1993, at the close of the government's case, Stephens moved for a judgment of acquittal. The district court granted this motion with respect to counts II and III, but submitted count I to the jury. On October 26, 1993, the jury found Stephens guilty of count I, for violating 18 U.S.C. § 1962(d). On November 2, 1993, Stephens renewed his motion for

*†* The Honorable George C. Pratt, Circuit Judge for the United States Court of Appeals for the Second Circuit, is sitting by designation.

acquittal of count I notwithstanding the verdict. The court denied his motion, and on January 21, 1994, sentenced Stephens to twenty-four months of imprisonment, to be followed by two years of supervised release, with a special assessment of $50.00. Stephens appeals. We AFFIRM.

## I. BACKGROUND

Cleo Stephens, Sr. was a Gary, Indiana police officer until he retired from the department in October, 1991. In 1987, Stephens was named commander of the Traffic Division and, in January, 1988, he was promoted to the position of Deputy Inspector in which he supervised the Detective and Public Morals Bureau. The Public Morals Bureau investigated drug crimes, gambling, prostitution, and illegal liquor sales. In May, 1990, he was elevated to the position of Inspector, the third highest ranking officer in the Gary Police Department, and had increased supervisory responsibilities.

The charges against him resulted from his involvement in a gambling and liquor establishment known as "Sidney's" or "Sid's Corner," located in Gary, Indiana. This operation was owned by Sidney Powell, who began operating a restaurant at this location in 1969, and allowed illegal gambling, including card and dice games. Powell split the proceeds with those running the games, keeping sixty percent of the profits. In the late 1970s, Powell expanded his business and began to serve liquor without a license while continuing his gambling operation.

At Stephens' trial, Powell testified that while operating Sidney's, he frequently gave Gary, Indiana, police officers free alcoholic beverages and money. He stated that he was of the opinion that if he had not done this, he would have been arrested for the illegal activities on his premises. He testified that it was the custom for owners of after-hours establishments in Gary, Indiana to give either money or alcohol or both to law enforcement officers. Powell stated that during this period he had provided money to at least twenty-five to thirty police officers, and free alcoholic beverages to at least ten or twelve officers since opening Sidney's in 1969.

Stephens was associated with Sidney Powell on a business as well as social basis, having been friends for many years. Powell began purchasing his liquor from Madison Street Liquors, which was owned by Stephens' wife Barbara Stephens, and her sister-in-law. Officer Stephens told Powell that if he purchased his liquor from Madison Street Liquors, Stephens would provide him with a ten percent discount on his orders. Powell testified that from 1986 to 1990, he purchased his alcohol retail from Madison Street Liquors in amounts of approximately $1000.00 per week and that he had been operating his business since the 1970's without a liquor license. In 1990, he obtained his first liquor license, and began purchasing liquor from a wholesaler, but shortly thereafter, in January, 1991, the Federal Bureau of Investigations (FBI) confronted Powell regarding drug dealing and seized some $5000.00 which he was going to use to pay his wholesalers. Powell stated that after he "got broke" from the FBI seizing his money, he resumed purchasing liquor from Madison Street Liquors.

Although Madison Street Liquors was owned by Stephens' wife, Stephens also actively participated in its operation. Arlene Washington, who worked as a clerk at Madison Street Liquors from 1988 until 1993, testified that Stephens frequently closed the store in the evening and on occasion opened it for business in the morning. He also frequently emptied the cash register, counted the money at night, withdrew a sum, and left an amount sufficient for the next day's business. Stephens also assisted customers, including Powell, on a number of occasions.

Stephens' association with Powell's liquor establishment involved far more than simply making liquor sales to Powell at the ten percent discount. Stephens, in his capacity as Deputy Inspector and Inspector of the Gary, Indiana Police Department, engaged in discussions on numerous occasions with other police officers who were either investigating or preparing to raid Powell's liquor establishment for gambling activities, illegal liquor sales, and drug dealings. Sergeant Lawrence Wright of the Patrol Division testified

that in 1986, he raided Powell's establishment a number of times because he was aware that Powell was selling liquor without a license. Some time during 1986, Sergeant Wright raided Sidney's and arrested Sidney Sledge for his participation in illegal activities at Sidney's. After this raid, Stephens suggested to Wright that he leave Powell and Sledge alone and further advised him that because of the frequency of the raids, his activities might be construed as harassment.

In February, 1987, Wright arrested Powell for selling liquor without a license. Approximately two or three weeks thereafter, Stephens had another chat with Wright and suggested that raiding Powell was not a high priority for the department and that in the future he should leave Powell's business alone. Wright disregarded Stephens' advice and raided Powell on two occasions thereafter.

William Hlas, who had been elevated to the position of Commander of the Public Morals Bureau (PMB), testified that on another occasion, in January, 1990, Inspector Stephens tried to dissuade him from taking action against Powell for his blatant disregard for the laws and ordinances of the State of Indiana and city of Gary. Hlas became aware of the fact that Powell was not cooperating with police officers who were investigating a homicide in the vicinity of Sidney's. Hlas stated that he advised Powell that if he did not cooperate, Hlas would be forced to raid his establishment because he knew Powell was operating without a license. The following day, not surprisingly, Stephens summoned Hlas into his office and told him that Sidney Powell was "not the enemy." While having this discussion with Hlas, in an attempt to make a point, Stephens held phone messages in his hand referring to drug trafficking, and stated that "[t]hese are your enemies, not Sidney. These are your enemy. The dope dealers are your enemy. You've got enough of them out there without being at Sidney's."

On September 12, 1990, Powell's son was arrested by Officers Earls, Bauswell, Bran-

son, and House for illegal gambling and selling liquor without a permit at Sidney's. Inspector Stephens later directed these officers to report to his office to discuss Sidney Powell's operation. As strange as it may seem, Powell attended this meeting with the officers, at which time Stephens again stated that Powell was "not the enemy," but, rather, was an informant for the police department. Stephens instructed the officers to confine their activities to the street corner outside of Powell's establishment. Officer Earls stated that he understood this instruction to mean that he should cease and desist raiding Sidney's.

Sergeant Carmella Green, a supervisor assigned to the Public Morals Bureau, testified at trial that she also had been told by Stephens that Powell was "not the enemy." Sergeant Green testified that as a result of this direction, she did not feel free to raid Powell for any law violation within his establishment without seeking Stephens' prior approval.

In 1990, the FBI, relying on information it received, commenced an undercover operation to investigate allegations that Gary Police officers were soliciting payoffs for protection of gambling operations. During this investigation, the FBI discovered that Sidney Powell was involved in the payoff scheme and that he was also distributing cocaine. As part of the investigation, the FBI installed pen registers on Powell's phones at his liquor establishment, in his car phone, and in his home.[1] At this time, the Bureau also obtained court authorization to install wiretaps on Powell's car and home phones. The pen registers recorded a total of eighty-nine telephone calls made from Powell's car and home phones to Madison Street Liquors between May, 1990 and January 17, 1991. The pen registers also recorded several calls made to Inspector Stephens' office at the police department. One of the phone calls, intercepted on the wiretap, was made on December 18, 1990, by Sidney Powell to Gwendolyn Campbell, a bartender at Sidney's. During this wiretapped conversation, Powell told

---

1. A pen register is a device attached to a telephone which records all outgoing calls made from that particular phone.

Campbell that he spoke with Stephens regarding a robbery incident at Sidney's the previous night. Stephens related to Powell that he had heard that someone at Sidney's possessed drugs. Stephens warned Powell of an impending drug raid by stating that he was going to send the narcotics squad to Sidney's. In this recorded conversation, Powell described this to Campbell by stating:

> "He say okay. He say well, I been gettin', uh, that there's a bag off a your place.... Okay. All right. So I said well, you know how that go Cleo. I say, uh ... he say no, not that you've got the bag. He said but maybe he got somebody with a bag up in there, but I been gettin' that ... there is a bag off in your place, and, well, I said well, I'll get through and check it out with a find ... he said but I'm gonna send the, I'm gonna send the narcotics squad down through there today."

The testimony has established that the term "bag," referred to in Powell's conversation, means drugs. In response to this warning by Stephens, Powell told Campbell that he was going to clear out all of the drug pushers from Sidney's. In reality, Stephens did send Officer Gordon to speak with Powell the next day, but Gordon did not raid Sidney's.

As a result of the FBI investigation, Stephens was indicted for RICO conspiracy violations, and a jury, after an eight day trial, found Stephens guilty of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. § 1962(d).

## II. ISSUES

Stephens raises two issues on appeal. Initially, he argues that the district court erred by failing to grant his motion for judgment of acquittal on count I because there was insufficient evidence to sustain his conviction. Secondly, Stephens contends that the district court erred by admitting in evidence the December 18, 1990 court authorized recorded telephone conversation between Sidney Powell and Gwendolyn Campbell because it is inadmissible under the co-conspirator exception to the hearsay rule, Rule 801(d)(2)(E) of the Federal Rules of Evidence.

## III. DISCUSSION

### SUFFICIENCY OF EVIDENCE

The standard of review for considering whether there is sufficient evidence to support a conviction is set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.; United States v. Howell*, 37 F.3d 1197, 1201 (7th Cir.1994). Reversal of a conviction is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992); *see United States v. Rosalez–Cortez*, 19 F.3d 1210, 1215 (7th Cir.1994).

Stephens argues that the record is insufficient to establish that he was associated with Sidney Powell, or that he conspired with anyone to conduct or participate in the affairs of Powell's enterprise, or that he willfully agreed to commit acts of bribery. We disagree.

Stephens, in count I, was charged with violating 18 U.S.C. § 1962 which provides that: "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," and "(d) [i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." The federal RICO charges under 18 U.S.C. § 1962 against Inspector Stephens of the Gary, Indiana police department resulted from Stephens' violations of the Indiana bribery statute, Ind.Code § 35–44–1–1, which provides that: "(a) A person who: ... (2) Being a public servant, solicits, accepts, or agrees to accept, either before or after he becomes appointed, elected, or qualified, any property, except property he is authorized by law to

accept, with intent to control the performance of an act related to his employment or function as a public servant; ... commits bribery, a Class C Felony."

■ Proof of participation in a RICO conspiracy requires the following: " '[t]o be convicted of a conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes.' " *United States v. Balzano*, 916 F.2d 1273, 1289 (7th Cir.1990) (quoting *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986)).

In order to convict a defendant for conspiracy under the RICO act, it must be established that the defendant was aware of the scope of the enterprise and intended to participate in it. In *Balzano*, this court stated:

To find a defendant guilty of conspiracy to violate RICO, the government must show that the defendant 'was aware of the essential nature and scope of the enterprise and intended to participate in it.' *United States v. Bruun*, 809 F.2d [397, 410 (7th Cir.1987)]. While there is no need to prove that the defendant intended personally to perform the two predicate acts required for RICO liability, *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986), the government does have to show more than 'mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions....' *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985); *see also United States v. Williams*, 798 F.2d 1024, 1028 (7th Cir.1986). The government has to show that there was an agreement between the members of the conspiracy. Of course, direct evidence of that agreement need not be shown, 'an agreement can be inferred from the circumstances.' *United States v. Neapolitan*, 791 F.2d at 501.

*Balzano*, 916 F.2d at 1289 (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir.1988)). There are "two aspects of the 1962(d) conspiracy that serve to limit the scope of the theory: (1) the nature of the agreement required and (2) the necessity of proving the existence of an enterprise." *Neapolitan*, 791 F.2d at 498.

■ Initially, we consider whether the government established the existence of an "enterprise" for purposes of RICO. "The term 'enterprise' is defined [in RICO] as including 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' ... There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact. On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope ..." *Balzano*, 916 F.2d at 1289–90, quoting *United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981).

■ Stephens was charged with being associated with and participating in an "enterprise" which consisted of the group of people who participated in the illegal activities at Sidney's. The evidence demonstrated that Sidney's is the "enterprise" for purposes of the RICO statute, as this was the venue for illegal liquor sales, gambling, and drug dealing. RICO's definition of an "enterprise" encompasses both legitimate and illegitimate businesses. *Turkette*, 452 U.S. at 580–81, 101 S.Ct. at 2527–28; *Russello v. United States*, 464 U.S. 16, 24, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983); *United States v. Blackwood*, 768 F.2d 131, 137 (7th Cir.1985).

■ Next, we turn to the question of whether Stephens agreed to participate, directly or indirectly, in the affairs of Sidney's (the enterprise), through the commission of two or more predicate crimes. Stephens argues that he did not participate in the affairs of Sidney's, nor did he have any agreement with Powell which involved any illegal conduct on his part. Specifically, Stephens contends that there is insufficient evidence to establish that he committed acts of bribery with Powell so that it would influence the exercise of his judgment as a police officer, thus providing a benefit to Powell.

This argument lacks support in the record. The evidence demonstrates that Stephens solicited Powell's business for Madison Street Liquors, his wife's liquor store, by offering him a ten percent discount on his purchases. Between 1986 and 1991, Powell purchased approximately $1000.00 of liquor per week from Madison Street Liquors. During this time-frame, Inspector Stephens stated to several police officers, who in the course of their duties as police officers in the Gary, Indiana Police Department were investigating Powell for known violations of Indiana criminal statutes, that Powell was "not the enemy," and further directed several officers to leave Powell alone, and to confine their law enforcement activities to the outside of Sidney's. Even if Stephens and Powell did not explicitly enter into an agreement, in a RICO conspiracy, "direct evidence of that agreement need not be shown, 'an agreement can be inferred from the circumstances.'" *Balzano,* 916 F.2d at 1289 (quoting *Neapolitan,* 791 F.2d at 501). "[W]hen the evidence establishes that the defendants committed during a time period 'several acts of racketeering in furtherance of the affairs of the enterprise, an inference of an agreement to do so may be drawn.'" *United States v. Melton,* 689 F.2d 679, 683 (7th Cir.1982) (quoting *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). " 'Because conspiracies are carried out in secret, direct proof of agreement is rare.'" *Balzano,* 916 F.2d at 1284 (quoting *United States v. Koenig,* 856 F.2d 843, 854 (7th Cir.1988)). "Not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support for a conviction." *Id.* (internal quotations omitted).

In *Balzano,* we described the agreement that must be proven in a RICO conspiracy:

> From a conceptual standpoint a conspiracy to violate RICO can be analyzed as composed of two agreements (in reality they would be encompassed by the same manifestations of the defendant): an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts. Thus, a defendant who did not agree to the commission of crimes *constituting a pattern of racketeering activity is not in violation* of section 1962(d), even though he is somehow affiliated with a RICO enterprise, and neither is the defendant who agrees to the commission of two criminal acts but does not consent to the involvement of an enterprise. If either aspect of the agreement is lacking then there is insufficient evidence that the defendant embraced the objective of the alleged conspiracy. Thus, mere association with the enterprise would not constitute an actionable 1962(d) violation. In a RICO conspiracy, as in all conspiracies, agreement is essential.

*Balzano,* 916 F.2d at 1290 (citations omitted).

Based on our review of the record, we hold that there was more than sufficient evidence for a rational jury to find that Stephens, by his acts and deeds, entered into an agreement with Powell to conduct or participate in the affairs of Sidney's, and that there was an agreement between Powell and Stephens to commit some seventy-five acts of bribery as defined by the Indiana bribery statute.

Stephens directly and indirectly participated in the affairs of Sidney's. Stephens initiated the contact with Powell regarding selling liquor to Powell at a ten percent discount from Madison Street Liquors, which involved almost $1000.00 per week. At Stephens' trial, Powell, in response to the question "[d]id you go to Cleo [Stephens] or did Cleo come to you?," replied: "[w]ell, I didn't know that Cleo had a liquor store. He told me he had one, and he would give me a ten percent discount." Although this store was owned by Stephens' wife, Barbara, Stephens was directly involved in the operation of the liquor store, in that according to the testimony of Arlene Washington, a former clerk at Madison Street Liquors, Stephens would close the store at night, open it in the mornings, take the cash receipts at night, and leave a sufficient amount of money for opening the next day, and would on occasion wait on customers, including Sidney Powell.

Obviously these liquor sales to Powell benefitted both Stephens and his wife. The jury could reasonably infer that these purchases from Madison Street Liquors at a ten per-

cent discount were made with the intent to control the exercise of Stephens' judgment as a law enforcement officer and formed the basis for the bribery charges against Stephens. The Indiana bribery statute provides that it is a felony for a public servant "to accept ... any property ... with intent to control the performance of an act related to his employment or function as a public servant." Ind.Code § 35–44–1–1(a)(2). Powell testified that at the time he started purchasing his liquor from Stephens, he knew that Stephens was a police officer with the Gary, Indiana Police Department, and thus, he was aware that Stephens was in a position to make judgments concerning the enforcement of the laws in Gary, Indiana, as they related to his tavern.

Although Powell stated that he did not have any verbal or written agreement with Stephens, the jury could infer from Stephens' conduct that there was an agreement that Stephens would provide protection for Powell's illegal operation, in exchange for Powell purchasing his liquor from Madison Street Liquors at a ten percent discount. The record establishes that Powell did expect assistance or some benefit from Stephens in exchange for Powell purchasing liquor from his wife's store. The following is the testimony which Powell gave at Stephens' trial:

Q: Mr. Powell, did you have an expectation from Mr. Stephens that if you needed assistance, you could get it from him?

A: Well, knowing him in person, I assumed I could.

Q: How about your relationship of buying liquor from him?

A: Well, yeah, that too.

Q: So you expected something in return; is that right?

A: If I needed it.

Q: Did you get it?

A: Well, no more than what I purchased from him, but I never got nothing for him to do anything.

Q: Sending Perry Gordon down wasn't doing anything?

A: That's different. He ordered that, not me.

. . .

Q: Is that the type of activity that you expected in return?

A: Yes.

. . .

Q: Out of all the liquor stores in the city of Gary, why would you go to Cleo Stephens to buy your liquor?

A: Well, I knew him personally, and I figured he had authority to do something about that.

Stephens argues that Powell's only expectations were that he wanted someone with authority to provide legitimate assistance to Powell for keeping drug dealers away from his business. However, the evidence demonstrates otherwise. The record contains a number of instances where Stephens, a high ranking official in the police department, attempted to protect Powell's illegal liquor and gambling operation from police investigations and raids by police officers. Initially, in 1986, after Powell had started purchasing his liquor from Madison Street Liquors, Sergeant Wright of the Patrol Division, raided "Sidney's" because Powell was selling liquor without a license. At some point in 1986, Wright again raided Sidney's and arrested a person known as Sidney Sledge. After this arrest, Stephens advised Wright that he should leave Powell and Sledge alone.[2] In February, 1987, Wright raided Sidney's and arrested Powell. After this arrest, Stephens reminded Wright about their previous discussion about Sidney's and told him that raiding Powell was not a high priority of the department, and that he should leave Powell alone. Wright testified that he understood this conversation to mean that he should leave Sidney's alone and not concern himself with the activities occurring inside of Sidney's.

Another police officer who had occasion to discuss Powell with Stephens was Sergeant Carmella Green, supervisor of the narcotics unit. The record reflects that at some point in 1989 or 1990, Inspector Stephens had told

2. At the time of Stephens discussions with Wright, Stephens was a commander in the traffic division and was not Wright's immediate supervisor, although he was Wright's superior in the command structure of the police department.

her that Powell was "not the enemy." She stated that this comment influenced her to the extent that she would not have raided Sidney's without checking first with Stephens.

In January, 1990, Inspector Stephens had a discussion with William Hlas, Commander of the Public Morals Bureau (PMB), after Hlas told Powell that he would raid him if he did not cooperate with a police investigation which was taking place in the vicinity of his establishment. Stephens summoned Hlas to his office and suggested to him, as he had done to other officers in the police department, that Powell was "not the enemy." Stephens stated, while referring to other drug dealers, "[t]hese are your enemy . . . [y]ou've got enough of them out there without being at Sidney's."

In addition, Inspector Stephens had a meeting with Officers Bauswell, Branson, Earls, and House, of the PMB, concerning raids on Powell. Sidney Powell was also present at this meeting which took place in Stephens' office, after September 12, 1990, when officers in the PMB arrested Larry Powell, Sidney Powell's son, for illegal gambling and selling liquor without a license at Sidney's. Stephens advised those present at this meeting that Powell was "not the enemy," and that he was, in fact, an informant for the police department. Stephens instructed the officers to confine their activities to the street corner outside of Sidney's. Thus, it seems rather obvious that the officers were not to concern themselves with enforcing the law within, and thus should not enforce the laws of the state of Indiana as applicable to, Sidney's.

Corporal Derrick Earls testified that he did not consider this statement as a joke, and that he reported it to his supervisors, as well as the persons in the PMB. Earls further testified that he understood this statement to mean that he should stop raiding Sidney's. He said that after this meeting, until July, 1991, the time in which he was with the Public Morals Bureau, he had been involved in other arrests outside of Sidney's, but that the inside of Powell's establishment was out of bounds and never a target for a raid.

Earls stated that Stephens' statements were a topic of frequent discussion among the police officers in the PMB, and that several officers were angry about them. Corporal John Jelks even posted a photograph of Powell on the bulletin board at the PMB, with the caption "He is not the enemy." [3]

In addition, in 1991, Officer Anthony Stanley of the Lake County Task Force, a division of the Gary Police Department, discussed with Stephens whether anything had been done about Sidney's. Inspector Stephens replied that Powell was not doing anything wrong.

All of these discussions demonstrate Stephens' intent to protect Powell's establishment from the enforcement of the Indiana statutes, i.e. gambling, illegal liquor sales, and drug sales. Stephens carried the title of Deputy Inspector and Inspector from 1988 through 1991, positions subordinate only to the Chief and Deputy Chief, and Officer David Wade testified that Stephens was responsible for overseeing the investigative services, supervising the detective division, auto division, juvenile division, and narcotic division (Public Morals Bureau). Because Stephens was responsible for supervising the PMB, which investigates drug crimes, illegal liquor sales, gambling, and prostitution, he was fully aware that Powell's business enterprise was frequently engaged in violations of the law. Officers Fazekas and Bauswell testified that between 1989 and 1991, the years in which they were assigned to the PMB, Sidney's was well known as a place for drug activity. Furthermore, the raids by Wright and Earls for illegal liquor sales and gambling prompted Stephens to direct several officers to leave Powell alone. This evidence also reflects upon Stephens' awareness of the illegal activities taking place at Sidney's. In spite of all this information, Stephens continued to have discussions with police officers and advised them not to raid Sidney's, and that Powell was "not the enemy."

Stephens argues that even if he said that Powell was "not the enemy," and that the officers should confine their law enforcement activities to the outside of Sidney's, this did

3. The photograph was taken of Powell sitting at a table gambling, with money in his hand.

not prevent officers from investigating Powell. However, it is obvious that Powell's discounted liquor purchases were intended to influence Stephens' judgment, as a high ranking police officer, causing him to instruct other officers that Powell was an informant of the department, and that they should look the other way with regard to the activities occurring inside of Sidney's. It is clear that Powell benefitted from Stephens' conduct of directing officers not to raid Sidney's, and advising them that he was "not the enemy," and to confine their activities to the outside of Sidney's. Under the Indiana bribery statute, "it is the soliciting or the receiving of money by an official to influence him with respect to his official duties that is the gravamen of the offense of bribery." *United States v. Forszt*, 655 F.2d 101, 103 (7th Cir. 1981). "Whether the public servant was actually controlled or influenced is irrelevant, so long as the payment was accepted or solicited with the *intent* to control the public servant." *Stuckey v. Indiana*, 560 N.E.2d 88, 92 (Ind.Ct.App.1990) (emphasis in original).

The record demonstrates that Stephens solicited Powell's business, and that he objectively manifested an agreement with Powell to participate in his enterprise through selling him liquor at a ten percent discount, in exchange for Stephens attempting to discourage police officers from raiding his establishment. Based upon the overwhelming evidence of guilt, we hold that there was more than sufficient evidence to convict Stephens of violating 18 U.S.C. § 1962(d) beyond a reasonable doubt.

## THE RECORDED TELEPHONE CONVERSATION BETWEEN SIDNEY POWELL AND GWENDOLYN CAMPBELL

■ Stephens argues that the district court erred in admitting evidence of the December 18, 1990 court authorized tape recorded telephone conversation between Sidney Powell and Gwendolyn Campbell, one of Powell's employees, and contends that statements made during the conversation were inadmissible under the co-conspirator exception to the hearsay rule, Rule 801(d)(2)(E) of the Federal Rules of Evidence.[4] Specifically, Stephens claims that he was not involved in a conspiracy, and that the statements made in the conversation were not made in furtherance of the conspiracy. Relevant portions of the conversation in which Powell called Campbell from his car phone are as follows:

SP: (Sidney Powell): I'm talkin' to the chief ... did I tell you what the chief said? . . .

SP: He say okay. He say well, I been gettin', uh, that there's a bag off a your place ...

SP: Okay. All right. So I said well, you know how that go Cleo. I say, uh ... he say no, not that you've got the bag. He said but maybe he got somebody with a bag up in there, but I been gettin' that ... there is a bag off in your place, and, well,. I said well, I'll get through and check it out with a find ... he said but I'm gonna send the, I'm gonna send the narcotics squad down through there today. He said, uh, you keep your I said he got my car number, then he said what's the number of the place. I give him that. He said I'm gonna call you. He said but Perry Gordon and them gonna come through there. I told him I said now I gotta lotta problems. I said I got some jokers that stand out there on the corner from the projects, and I don't know'em, and I said when I attempt to, uh, uh, get on their backs about it, they try to burn the building down in the back . . .

SP: So I made up my mind that all drug pushin' is out and now. That means ... everybody....

SP: 'cause Trice and all of 'em are gonna have to take it outta there.

GC (Gwendolyn Campbell): Yea, 'cause you said the man they comin' through there, uh.

4. Rule 801 provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

SP: They comin' through. They're comin' through, and today, not tomorrow, today.

GC: Um hum.

SP: So that, that ... in other words that means clean ... get your act cleaned up.

■ The trial court's evidentiary rulings are reviewed for abuse of discretion. *Berry v. Deloney,* 28 F.3d 604, 607 (7th Cir.1994). "An appellant challenging a trial court's evidentiary rulings has an onerous burden 'because a reviewing court gives special deference to the evidentiary rulings of the trial court.'" *Id.* (quoting *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1183 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993)).

■ Under Rule 801(d)(2)(E), a statement made by a member of the conspiracy is admissible against other members of the conspiracy if made "during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). The government must prove "that (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the offered statement was made during the course of and in furtherance of the conspiracy." *United States v. Troop,* 890 F.2d 1393, 1403 (7th Cir.1989). "A district court's factual determination as to the existence of these elements is only reversed if it was clearly erroneous." *United States v. Schumpert,* 958 F.2d 770, 773 (7th Cir.1992).

We have ruled that a conspiracy existed because Stephens and Sidney Powell had an agreement where Powell would purchase liquor from Stephens at a ten percent discount, and Stephens would attempt to and in fact did exercise his influence over members of the Gary Police Department to discourage them from raiding Powell's business establishment. Since Powell and Stephens were members of the conspiracy, and it is undisputed that the recorded conversation of December, 1990 took place during the course of the conspiracy, we need only decide whether the statements made during the telephone conversation were in furtherance of the conspiracy.

■ A statement may be found to be in furtherance of a conspiracy so long as "some reasonable basis exists for concluding that the statement furthered the conspiracy." *United States v. Shoffner,* 826 F.2d 619, 628 (7th Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987) (citing *United States v. Mackey,* 571 F.2d 376, 383 (7th Cir.1978)). During the conversation, Powell told Campbell about a discussion he had with Stephens. Powell advised Campbell that Stephens had told Powell that he had heard that there was a "bag off a your place."[5] Stephens also gave Powell advance notice that he was going to send the narcotics squad to Sidney's. In response to Powell's conversation with Stephens, and the advance warning that the narcotics squad was going to be sent to Sidney's, Powell told Campbell that he decided that all of the drug pushers were going to be cleared out of his business establishment, and that "Trice and all of 'em are gonna have to take it outta there." Powell said, while referring to the narcotics squad, "they're comin through, and today, not tomorrow, today ... in other words that means ... get your act cleaned up." The next day, Stephens sent Officer Gordon of the narcotics squad to Sid's Corner but Gordon did not raid Sidney's on this occasion.

Stephens' statements to Powell stating that he had heard that someone may be dealing drugs at Sidney's and that he was going to send the narcotics squad to Sidney's is obviously a warning that Sid's Corner was going to be raided. This is further evidenced by Powell's statement to Campbell that "in other words that means ... get your act cleaned up." Campbell testified that she was a bartender at Sidney's since 1989, and that she, at the direction of Powell, began selling packages of cocaine inside and outside of Sidney's. Obviously, during the same conversation, Powell's statement to Campbell during her employment at Sidney's to "get your act cleaned up" implied that she should get all of the drugs and drug dealers out of

---

**5.** The testimony has established that "bag off a your place" refers to drugs on the premises for sale.

the premises in order that Sidney's might continue to operate, and thus not be shut down. Thus, Stephens' statements to Powell regarding sending the narcotics squad to Sidney's, as well as Powell's statements to Campbell, can only be interpreted as furthering the conspiracy to protect Powell's business, the "enterprise," by allowing Powell the opportunity to eliminate the drugs from his business before the police arrived. We thus hold that the district court's allowing the statements to be received in evidence was not clearly erroneous as they were made in furtherance of the conspiracy, and furthermore, the court did not abuse its discretion in allowing the contents of the telephone conversation also to be received in evidence.

## IV.  CONCLUSION

Cleo Stephens' judgment of conviction is hereby

AFFIRMED.