UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank A. STEPHENSON, Michael L. Tate, and Donnell M. Hill,
Defendants–Appellants.

Nos. 94–2435, 94–2436 and 94–2437.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1995.

Decided May 8, 1995.

David E. Risley (argued), Rodger A. Heaton, Asst. U.S. Atty., Office of the U.S. Atty., Springfield, IL, for plaintiff-appellee.

Steven C. Mills, Springfield, IL (argued), for defendants-appellants.

Before MANION and ROVNER, Circuit Judges, and NORGLE, District Judge.*

NORGLE, District Judge.

This is the consolidated appeal of three defendants, all of whom were convicted of various offenses arising out of a conspiracy to distribute cocaine in Springfield, Illinois. Defendants challenge their convictions and sentences on several grounds. We affirm the district court in all respects.

## I.

Defendants Donnell M. Hill ("Hill"), Michael L. Tate ("Tate"), and Frank A. Stephenson ("Stephenson") were charged in a five count indictment. Count I charged that Defendants conspired with each other and Harrison Richard King ("King") to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count I also alleged that defendants committed the acts alleged in

---

[1] The Honorable Charles R. Norgle, Sr., United States District Judge for the Northern District of Illinois, sitting by designation.

Counts II, III, IV, and V in furtherance of the conspiracy. Count II charged defendants with attempting to possess cocaine and cocaine base with the intent to distribute on December 9, 1991, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). Count III charged defendants with using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). Counts IV and V charged Tate with distributing cocaine base ("crack") in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). The jury found all defendants guilty of Counts I, II, and III. The jury found Tate guilty of Count IV but not guilty of Count V.

The facts adduced at trial revealed that King was a member of the Gangster Disciple gang which was affiliated with a Springfield gang known as the Eight Ball Posse. The Eight Ball Posse was formed in 1989 by Alphonso Hatchett and originally consisted of approximately thirteen people. The purpose of the association was primarily cocaine distribution, and King was one of the principal cocaine suppliers to the Eight Ball Posse. The original membership of the Eight Ball Posse included, among others, Myron Barber ("Barber"), King, Tate, and Hill.[1]

The Eight Ball Posse began falling apart after Alphonso Hatchett was killed by a rival gang member. At that point, King, Tate, Hill, and Stephenson began dealing drugs on their own as a partnership ancillary to the Eight Ball Posse. Thus, not all of that smaller group's dealings were connected to the Eight Ball Posse.

In September 1991, Michael Harris ("Harris") began buying cocaine from King. Generally, these transactions involved four and one-half to nine ounces of cocaine at a time, which King would "front" to Harris by allowing him to pay for the drugs after Harris sold them. Nonetheless, on one occasion near the end of October 1991, Harris bought a quarter kilogram of cocaine from King for cash. He gave King $5,000 initially, and two days later King and Hill came to Harris's house. Hill handed Harris the package containing nine ounces of cocaine, and Harris gave King the $2,500 remaining balance. Harris went downstairs and put the drugs in his safe while King and Hill remained upstairs.

Prior to November 1991, King purchased cocaine through Dorothy Gragg ("Dorothy"), whose source lived in Chicago. Dorothy was the wife of Willis Gragg ("Willis") who had been a major cocaine supplier for Springfield until he was imprisoned. Dorothy carried on Willis's business after his incarceration. Dorothy was able to perpetuate the family dynasty because the Chicago source would not deal with anyone other than her. Also during her husband's incarceration, Dorothy became King's girlfriend. Predictably, this created tension between King and Willis.

Tired of making the trip with Dorothy himself, in September or October 1991, King paid Harris to go to Chicago with Dorothy and purchase cocaine. The duo, carrying $40,000 in cash, half of which was King's, drove to Chicago and purchased two kilograms of cocaine.[2] The other half of the money belonged to Robert Wallace ("Wallace"), King's friend and close business associate.

Willis was released from prison in late November of 1991. After his release, he cut off Dorothy's independent connection to the Chicago source and channelled all access to that source of cocaine through himself. At this point, Harris stopped buying cocaine from King and began purchasing from Willis.

Soon after his release from prison, Willis sent Dorothy and Harris up to Chicago to purchase cocaine. Carrying $46,000, the pair drove to Chicago and obtained a motel room. Dorothy telephoned the source, who informed her that the runner would not be able to pick up the money right away. She then called Willis and told him that they had arrived too late and would need to spend the night in Chicago. She also called King and advised him that if he wanted to purchase any cocaine, he had to bring the money to Chicago.

---

1. Stephenson was not a member of the Eight Ball Posse.

2. At another point in his testimony, Harris contradicted this statement by testifying that none of the money in this transaction belonged to King. (Tr. at 122.)

King appeared at the hotel the next morning and was shocked to find Harris there. King left $18,500 with Dorothy and told her that he would see her when she returned to Springfield. After King left, Dorothy purchased three and one-half kilograms of cocaine from the source and brought it back to Springfield. She gave Harris a kilogram, evidently to store for Willis, and took two and one-half kilograms to give to King and Wallace.

On December 7 or 8, 1991, roughly ten days after the above transaction, Willis sent Harris and Dorothy to Chicago again. They brought along approximately $48,000 to purchase two and one-half kilograms of cocaine.

On returning to Springfield, Dorothy and Harris brought the cocaine to Willis's house, where he lived with his parents. The two talked with Willis, his father and a few other people. A short time later, King, Hill, Tate, and Stephenson joined the group at the house. King asked Willis whether he had purchased any cocaine. Willis told King that he should mind his own business. During the conversation, the cocaine was in a gym bag on the floor where everyone in the room could see it. Harris surmised that King knew there was cocaine in the bag. After Willis told King to mind his own business, King, Hill, Tate, and Stephenson left the house laughing.

Ten minutes after King and Defendants left, Harris took one kilogram of the cocaine to store in his safe for Willis and left the house. Dorothy took one and one-half kilograms to Wallace who, along with Willis, had provided the money for the contraband.

Harris, with the help of Carl Bell and Darryl Fane, cooked one-half ounce of the cocaine into crack. He separated out four and one-half ounces and delivered it to Willis. Harris separated the rest of the cocaine out into one ounce bags and stored it in the safe in two separate brown paper bags: one bag contained twenty ounces and the other contained nine ounces. The nine ounces were Willis' payment to Harris for making the trip to Chicago. At that time, the safe also contained a bracelet, some food stamps, and a .380 caliber pistol.

King knew about Harris's safe because he had seen Harris store cocaine there during their prior drug dealings. Dorothy knew that Harris stored cocaine for Willis in the safe, and Harris assumed that King knew it as well.

At approximately 12:30 p.m. the next day, December 9, 1991, Stephenson, Hill, and Tate attempted to rob Harris of the contents of his safe. Stephenson knocked and was allowed entry by a fourteen year-old boy named Damion Champion. After Stephenson was inside, Hill and Tate pushed their way into the house. Hill was carrying a nine millimeter semi-automatic pistol. When Harris entered the room, Hill stated: "This ain't no joke. This is a stick-up." Stephenson then added: "He's not joking. Come on. Take us to the safe." (Tr. at 69–70.)

The group went down to the basement with Hill holding the gun to Harris's head. Once in the basement, Defendants demanded that Harris open the safe. Stephenson stated that if Harris did not open the safe, Hill would shoot him. Stephenson then broke a fluorescent light bulb across Harris's face, and Hill followed up by hitting him in the head with the gun. Harris fell to the floor, and Hill and Stephenson beat him on the chest, all the while demanding that he open the safe.

While this was occurring, Tate was walking through the house picking up small items, such as a camcorder and camera. He appealed to Hill and Stephenson to leave because he did not believe that Harris would open the safe. At some point, Damion Champion broke away from Defendants and ran out of the house. Hill then stated that he could get Harris to open the safe by threatening the lives of Harris's children. When Stephenson went upstairs to look for the children, Harris got off the basement floor and ran out of the house. A truck stopped and the driver radioed for help. Subsequently, the police arrived and Harris went to the hospital where he received three stitches on the side of his face.

Lakenya Champion (Damion's sister) who shared the residence with Harris, gave the police permission to search the house. When asked about the safe, Lakenya stated that it

belonged to King and asked that the police remove it from the house. The police brought the safe to the Springfield Police Department, and after obtaining a search warrant, opened the safe. It contained a brown paper bag with seventeen clear plastic bags containing cocaine, another brown paper bag with eight plastic bags of cocaine, and three loose plastic bags with crack. In total, there were 676.6 grams of cocaine and 15.6 grams of crack.

On February 11, 1992, in a tape-recorded conversation with Barber, who was acting as a Drug Enforcement Agency ("DEA") informant, Hill admitted that he and the other defendants had tried to rob Harris of his money and drugs; that they had done so by threatening him with the nine millimeter pistol; and that they had beaten Harris in the process. The tape recording was admitted into evidence with a transcript provided to the jury. In the conversation, Hill described how Harris's brother, Marcus, had told Stephenson that he intended to retaliate against King for what had happened to Harris. Hill also described how King, Hill, and some others had confronted John Brown, a relative of Harris. Later in the conversation, Hill and Barber discussed the growing feud between King and the extended Harris family started by the robbery incident of December 9, 1991.

On April 13, 1992, DEA agent John Schaefer ("Schaefer") placed a telephone call to King's pager number. King returned the call. Later that day, Schaefer placed another call to that number. A person identifying himself as "Cut–Up," Tate's nickname, returned the page.

Also on April 13, 1992, DEA agents sent Barber to purchase crack from Tate while wearing a radio transmitter fitted to his body. DEA agents recorded the serial numbers of $500 in currency and gave it to Barber as "buy money" to purchase the crack. The transaction was tape recorded, and the tape and a transcript of the conversation were entered as exhibits.

Barber met with Tate at Barber's aunt's house in the John Hay Homes Housing Projects in Springfield. Hill came in and left the apartment near the beginning of the transaction. Barber asked for five-sixteenths of crack and then negotiated a sixth-sixteenth as a volume discount.[3] Tate only had two-sixteenths on him, so he left to go to his apartment next door. While he was gone, Barber looked out the window and saw King arrive. While Barber was watching, King was talking to Hill and two other men. Barber saw Tate go out of the building, talk to King and then come back inside. When Tate came inside, he informed Barber that in the future he would have to purchase ten-sixteenths at a time. Barber gave Tate the $500 in exchange for the six rocks of crack. Tate then walked outside and gave the money to King.

On April 14, 1991, the Springfield Police stopped King for a traffic violation. The officer received King's consent to search the car and found $5,000 in cash. Of the $5,000, the serial numbers on $320 matched the "buy money" given to Barber the previous day.

At trial, Harris testified that in September 1991, King told him that Hill was King's employee. Harris also testified that in September of 1991, King stated that he fronted both Hill and Tate two or three ounces a week. King also told him that Tate would deliver drugs and pick up money for him. Harris also testified that King stated that he fronted Stephenson three to four ounces a week. Harris further testified that King told him that King would give Stephenson cocaine and Stephenson would store it in the freezer at Long John Silver's. When someone wanted to purchase cocaine, they could sit down in the restaurant, eat, and pick up the drugs.

Barber testified that Tate was King's "right-hand man" and that when anyone needed drugs, Tate would deliver them for King. He also testified that he had personally seen Tate make deliveries and pick up money for King. Barber testified that Stephenson also distributed drugs for King. He stated that he knew Stephenson personally and that he had seen Stephenson and Tate selling drugs in the John Hay Homes Housing Projects.

---

**3.** Each "sixteenth" is one-sixteenth of an ounce.

Bruce Green ("Green") testified at trial that during the late summer of 1991, he was present on three occasions when King delivered one quarter kilogram quantities of cocaine to Lynard Joiner ("Joiner"). On two other occasions during the same time period, he was present when Tate delivered quarter kilogram quantities of cocaine in exchange for money. On the first occasion, when Tate arrived, he stated that the cocaine was from King, and Joiner gave Tate a brown paper bag containing $10,000 that Green had helped Joiner count. On the second occasion, Joiner did not inform Green how much money he paid for the cocaine. However, Green did see Joiner give Tate a brown paper bag, and he also saw Joiner remove a quarter kilogram of cocaine from the brown paper bag that Tate gave Joiner.

Green testified that he had observed Stephenson selling either cocaine or crack in the housing projects on several occasions. When Stephenson would run out of drugs, King would drive up and Stephenson would get in the car. The two would drive around for a block or two, and when Stephenson would come back he would have drugs to sell.

## II.

### A. Admission of Co-conspirator's Statements

Defendants' first contention on appeal is that the trial court erred by allowing Harris to testify about King's statements to Harris regarding Defendants' role in the conspiracy.[4] Defendants charge that there was insufficient independent evidence that they were members of the conspiracy alleged in the indictment to allow the statements into evidence as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Defendants also charge that the statements were not made in furtherance of the conspiracy, and that admission of the statements violated the Confrontation Clause of the Sixth Amendment.

■ Under Federal Rule of Evidence 801(d)(2)(E) statements made by a co-conspirator during the course and in furtherance of the conspiracy are not hearsay. *United States v. Williams*, 44 F.3d 614, 617 (7th Cir.1995). For a statement to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the person making the statement were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Brookins*, 52 F.3d 615, 623 (7th Cir.1995); *United States v. Stephens*, 46 F.3d 587, 597 (7th Cir.1995). We review a trial court's determination that the government has proved these elements under a clearly erroneous standard. *Stephens*, 46 F.3d at 597.

■ The analytical waters in this case are muddied somewhat by the trial court's failure to make a preliminary ruling under Federal Rule of Evidence 104(a) as to whether it was more probable than not that Defendants were members of King's conspiracy. Defendants have raised this as a separate issue on appeal. This court has directed that district courts make a ruling on the admissibility of a co-conspirator's statements pursuant to Rule 104(a) before they are admitted at trial. *United States v. Santiago*, 582 F.2d 1128, 1130–35 (7th Cir.1978); *United States v. Cox*, 923 F.2d 519, 526 (7th Cir.1991). However, a district court's failure to make *Santiago* findings will not be reversible error so long as the evidence in the trial record would support such findings. *United States v. Nicosia*, 638 F.2d 970, 974 (7th Cir.1980) *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *United States v. South*, 28 F.3d 619, 625 n. 2 (7th Cir.1994). Therefore, we need not address this issue separately as it is subsumed within our analysis of whether the statements were properly admitted.

4. Without identifying any specific statements, Defendants charge that statements made by King to Barber were improperly admitted. Because they have failed to specifically identify any statements that they contend were erroneously admitted, the issue is waived as to any statements King made to Barber. *United States v. Williams*, 877 F.2d 516, 519 (7th Cir.1989) *cert. denied*, 493 U.S. 863, 110 S.Ct. 180, 107 L.Ed.2d 136 (1989). Nonetheless, we note that we came across no testimony by Barber regarding statements made to him by King implicating Defendants.

We review a district court's *Santiago* findings on a clearly erroneous basis. *Stephens,* 46 F.3d at 597. The government, however, notes that Defendants only objected to the admission of two co-conspirator statements and failed to renew their objection at the close of the government's case, *see United States v. Andrus,* 775 F.2d 825, 837 (7th Cir.1985); *Santiago,* 582 F.2d at 1131, and, thereby, have waived the issue, leaving us to review the admission of all co-conspirator statements for plain error. *See United States v. Haddad,* 10 F.3d 1252, 1257 (7th Cir.1993) (holding that a conditional ruling by the district court does not preserve an issue on appeal unless the defendant renews his objection or seeks reconsideration); *United States v. Dougherty,* 895 F.2d 399, 403–04 (7th Cir.1990). While we are inclined to agree with the government, *see United States v. Maholias,* 985 F.2d 869, 877 (7th Cir.1993) (holding that defendant's failure to object to co-conspirator's statements waived the issue on appeal, requiring review only for plain error), we need not decide which is the appropriate standard because there was ample evidence to show that Defendants were members of King's conspiracy, and admitting the evidence was not error, clear or otherwise.

■ In determining whether a defendant was a member of a conspiracy for the purposes of Rule 801(d)(2)(E), the court can consider the statements sought to be admitted. *Williams,* 44 F.3d at 617; *Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). The government is not required to prove that there was a formal agreement, and circumstantial evidence indicating the defendant's membership in the conspiracy can also be considered. *United States v. Schumpert,* 958 F.2d 770, 773 (7th Cir.1992).

Defendants admit there was a conspiracy to sell drugs headed by King and including Harris, Willis, Dorothy, Tracy Williams, Carl Bell, and others (the "King conspiracy"). Defendants also admit that the three of them conspired to rob Harris of the contents of his safe. What they do contest is whether the government demonstrated that they were members of the King conspiracy. However, their contention is meritless.

■ To show that a defendant was involved in the conspiracy, the government must show that he "(1) knew of the conspiracy, and (2) intended to associate himself with the criminal scheme." *Id.* (quoting *United States v. Sullivan,* 903 F.2d 1093, 1098 (7th Cir.1990)). There was substantial evidence introduced at trial showing that Defendants were members of the King conspiracy. Barber testified that Tate was King's "right-hand man" and that he was a member of the special group which developed around King when the Eight Ball Posse began losing strength. Barber testified that Tate delivered drugs and picked up money for King.

Green testified that he had observed King deliver quarter kilogram quantities of cocaine to Lynard Joiner. During the same time period, he also was at Joiner's home when Tate delivered quarter kilogram packages of cocaine to Joiner. On both occasions, he witnessed Joiner give Tate a brown paper bag containing currency in exchange for the drugs. On the first occasion, Green heard Tate say "Richard [King] sent this by." (Tr. at 634.) It is reasonable to infer from the circumstances that Tate was delivering drugs for King on both occasions, even though Tate did not announce his agency status during the second transaction.

On April 13, 1992, when DEA agent Schaefer placed a telephone call to a pager subscribed to by King, someone referring to himself as "Cut–Up," Tate's nickname, answered the page. Also on April 13, 1992, Tate engaged in a drug transaction with Barber that the DEA observed and recorded. Tate and Barber met in the John Hay Housing Projects in the home of Tate's aunt. After negotiating the deal, Tate left to go next door to his home to obtain enough crack to fill Tate's order. During his absence, Barber observed King arrive and Tate go outside. He then saw Tate speaking with King and Hill. When Tate returned, he told Barber that in the future Barber would have to buy ten-sixteenths at a time instead of a lesser amount. Barber gave Tate $500 of DEA "buy money." Barber witnessed Tate give the money to King. The next day, $320

of the money was in King's car when he was stopped for a traffic violation. A reasonable inference from these facts is that Tate's statement to Barber that he would have to buy ten sixteenths at a time in the future was made at King's direction. That Tate gave King the buy money also strongly supports the inference that Tate was selling drugs for King when he sold the crack to Barber.

Barber also testified that Stephenson was a part of King's side group which formed after the Eight Ball Posse began to disintegrate, and that Stephenson sold drugs for King. He stated that he had seen both Stephenson and Tate selling drugs outside of the John Hay Homes Housing Projects.

Green testified that he had observed Stephenson selling cocaine or crack in the housing projects on several occasions. He testified that on several occasions, he observed that when Stephenson would be out of drugs, King would drive up and Stephenson would get in the car. The two would drive around for a while in King's car. Upon his return from these excursions, Stephenson would have drugs to sell. The inference from these facts is that Stephenson was selling cocaine for King.

Green also testified that on one occasion when he purchased some cocaine from King, Stephenson and Tate were with King when Green arrived. After Green placed his order for two ounces with King, Stephenson accompanied King when he went to pick up the drugs.

Barber testified that Hill was also a member of King's special group. In addition, Harris testified that at the end of October 1991, Harris gave money to King for a quarter kilogram of cocaine. A few days later, Hill and King came to deliver the drugs. Hill personally handed Harris the package containing the cocaine.

In addition to all of the above, there is Harris's testimony which Defendants charge was improperly allowed. Harris testified that King told him that each of the three Defendants sold drugs for King. Harris testified that King informed him that he fronted both Tate and Hill two or three ounces per week, and that Tate would deliver drugs and pick up money for him. Harris also stated that King told him that he fronted Stephenson three to four ounces of cocaine per week, and that Stephenson would store cocaine in the freezer at the restaurant where he worked.

Moreover, the circumstances surrounding Defendants' attempt to rob Harris give rise to a strong inference that the attack was perpetrated as a part of King's overall drug conspiracy. The day before the attempted robbery, King, Hill, Tate, and Stephenson all arrived at Willis's house together. Dorothy and Harris had just arrived from Chicago with two and one-half kilograms of cocaine, which was in a gym bag within everyone's view. Everyone looked at the bag, and Harris believed that King knew that there was cocaine in the bag. When King asked Willis if he had purchased any cocaine, Willis rebuffed him by telling him to mind his own business. After that, King and Defendants walked out laughing.

King knew of Harris's safe from their earlier dealings. Dorothy knew that Harris was storing cocaine for Willis at the time of the attack; Harris assumed that King knew this as well because Dorothy was King's girlfriend at the time, notwithstanding that she was married to Willis. Furthermore, Dorothy had already proven her loyalty to King, and faithlessness towards Willis, by her continued association with King, and by calling King from Chicago and purchasing drugs on his behalf behind Willis's back. All of these events were roughly contemporaneous with Willis's release from prison and his reassertion of himself into the Springfield cocaine market by restricting all access to his Chicago cocaine source. Moreover, Harris testified that Defendants' expressed purpose in robbing him was to obtain drugs.

While somewhat involved, these facts easily give rise to several inferences: Dorothy told King that Harris was storing drugs for Willis generally; she told King that she and Harris had gone to Chicago and bought cocaine for Willis on December 8, 1991; King, Hill, Tate, and Stephenson knew that the gym bag in Willis's house contained cocaine; Dorothy told King that Harris was storing some of the latest shipment of cocaine for

Willis; King needed drugs because Willis had restricted access to the Chicago source; and finally, King sent Defendants to rob Harris of the drugs he was keeping in his safe so that King could sell them.

Additional evidence that gives rise to the inference that King ordered the robbery attempt is Hill's conversation with Barber in which Hill recounted Marcus Harris's (brother of Richard Harris) threat to retaliate against King for the attempted robbery, and the growing feud between King and the extended Harris family.

The unchallenged trial testimony, the circumstantial evidence, and the testimony of Harris which Defendants have challenged as hearsay, all show clearly that Defendants were members of King's overall conspiracy to distribute cocaine. Thus, the government showed by a preponderance of the evidence that the conspiracy existed and that Defendants were members of the conspiracy.

■ However, Defendants also contend that King's statements to Harris were inadmissible because they were not made in furtherance of the conspiracy. Statements made to keep co-conspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy. *United States v. Curtis,* 37 F.3d 301, 307 (7th Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995). However, idle chatter and narrative declarations are not. *Id.* Statements by a co-conspirator are made in furtherance so long as "some reasonable basis exists for concluding that the statement furthered the conspiracy." *Stephens,* 46 F.3d at 597 (7th Cir.1995) (quoting *United States v. Shoffner,* 826 F.2d 619, 628 (7th Cir.1987) *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987)).

Defendants contend that King's statements were idle chatter. We disagree. Harris and King were members of the conspiracy at the time King made the statements. King's statements described Defendants' actions with particularity. It is reasonable to infer in this instance that King's statements regarding the extent of the organization and its operatives were made to serve as a salesmanship technique to enhance his position in the

eyes of Harris and give confidence about the stability of the organization. *See United States v. Sophie,* 900 F.2d 1064, 1073 (7th Cir.1990) *cert. denied,* 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990) (holding that statements about prior drug deals furthered the conspiracy by inspiring confidence in the source). At the time King made the statements, Harris had just begun dealing with King and, thus, such efforts at confidence building by King would be natural.

The preponderance of the evidence showed that Defendants were members of the King conspiracy and that the statements by King were made during the course and in furtherance of the conspiracy. Therefore, the court's decision to admit the statements was not error, clear or plain. Because the statements were properly admitted pursuant to Federal Rule of Evidence 801(d)(2)(E), their admission did not violate the Confrontation Clause of the Sixth Amendment. *United States v. Dugan,* 902 F.2d 585, 590 (7th Cir. 1990); *Shoffner,* 826 F.2d 619, 630 n. 14 (1987).

### B. *Sufficiency of the Evidence and Variance*

■ Defendants assert that the government failed to prove that their conspiracy to rob Harris was connected to King's conspiracy to distribute drugs. They style this a variance argument because they contend that there were two conspiracies and the indictment alleges only one. Defendants also contend that the indictment was defective and that the defect exacerbated the variance problem.

According to Defendants, the indictment was defective in that Paragraph 2 of Count I alleged that as part of the conspiracy alleged in Count I, Defendants committed the acts alleged in Count II. As a result, they assert that if the jury found them guilty of being part of the King conspiracy, then it would have to find them guilty of attempting to rob Harris's safe. Or, on the contrary, if the jury found them guilty of attempting to rob Harris, then it would have to find them guilty of conspiring with King.

Defendants have not described how this indictment differs in any respect from any other indictment charging a conspiracy to distribute drugs and illegal acts in furtherance of the conspiracy; they do not cite to any case law finding similar indictments defective; they do not suggest any alternative wording that would alleviate the alleged problem; and they do not state that they objected to the form of the indictment in the court below. Furthermore, the jury's verdict in the case proves the speciousness of their contention. The language that Defendants challenge in Count I of the indictment makes no distinction between the acts alleged in the other counts.[5] Consequently, their argument that the indictment was defective because a guilty verdict on Count I would mandate a guilty verdict on Count II should hold as to Counts III through V. However, the jury found Tate not guilty of Count V but guilty of Count I. This demonstrates that the jury understood that a conviction on Count I did not mandate a conviction on any of the other counts as Defendants argue.

■ As for the variance argument, Defendants have a heavy burden to carry. A claim that the facts proved at trial showed multiple conspiracies as opposed to a single conspiracy "is characterized as a challenge to the sufficiency of evidence supporting the defendant's conspiracy conviction." *United States v. Testa*, 33 F.3d 747, 750 (7th Cir.1994); *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). We will uphold a jury's conclusion that Defendants joined a single conspiracy if any rational jury could have found, beyond a reasonable doubt, that there was one conspiracy. *United States v. Nava–Salazar*, 30 F.3d 788, 796 (7th Cir.1994); *see also United States v. Briscoe*, 896 F.2d 1476, 1504 (7th Cir.1990) *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

■ In order to prove that Defendants joined the King conspiracy, which they concede existed, the government need only show a participatory link between them and the conspiracy. *See United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990).

That participatory link must be demonstrated with substantial evidence. *Id.* at 1229. Nonetheless, the government is not required to prove specifically with whom Defendants conspired or that they knew all the conspirators. *United States v. Smith*, 995 F.2d 662, 666 (7th Cir.1993) *cert. denied*, —— U.S. ——, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994). The government need only show that Defendants knew of the conspiracy and intended to join it. *Id.; see also South*, 28 F.3d at 627. Defendants' participation can be proved by circumstantial evidence alone. *Id.; see also Briscoe*, 896 F.2d at 1505. When reviewing a jury's determination that Defendants joined the conspiracy:

> it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of [inaccurate] or ambiguous inference...."

*United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1983) (quoting *United States v. Kwitek*, 467 F.2d 1222, 1226 (7th Cir.1972) *cert. denied*, 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)).

■ Because we have thoroughly discussed the evidence, direct and circumstantial, connecting Defendants to the King conspiracy in discussing whether the co-conspirator statements were properly admitted, we will not belabor the point here. It is sufficient to note that there was substantial evidence indicating that Defendants were members of King's conspiracy to distribute cocaine. More specifically, there was substantial evidence demonstrating that King and Defendants knew that Harris was storing cocaine for Willis at the time they attempted to rob him, and that they did so at King's direction. Therefore, there was clearly sufficient evidence on which a rational jury could base Defendants' convictions.

---

**5.** Paragraph 2 of Count I states:
As part of the conspiracy (alleged in paragraph 1) the defendants, among other things, committed the acts alleged in counts 2 through 5 of this indictment.
(Indictment, R. at 1.)

### C. *Jury Instructions*

■ Defendants raise two issues regarding the jury instructions. The first issue relates to government instruction 18–A which was given over Defendants' objection. The instruction read:

The government need not prove with whom a particular defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group of persons named in the indictment.

(Gov.Inst. 18–A, R. at 35.) Notwithstanding that this is almost a direct quote from our decision in *Townsend*, 924 F.2d at 1389 (7th Cir.1991), Defendants still contend that the instruction was erroneously given in that, because the indictment named King, the government had to prove that Defendants conspired with him specifically.

■ We review jury instructions as a whole, and so long as they treat the issues fairly and adequately, we will not disturb them on appeal. *United States v. Sax*, 39 F.3d 1380, 1388 (7th Cir.1994); *United States v. Jackson*, 51 F.3d 646 (7th Cir.1995). Defendants' argument fails for two reasons. First, *Townsend* makes it clear that the instruction is correct as a matter of law. Second, as discussed above, the government proved that Defendants conspired with King. Therefore, we find no error with the trial court's decision to give the instruction.

According to Defendants, Government Instruction 18 was also fatally flawed. The instruction read in part:

In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all of the circumstances and the conduct of all the alleged participants. In determining whether the defendant became a member of the conspiracy you may consider only the evidence concerning the acts and statements of that particular defendant. *In determining what the defendant's acts and statements were you may consider all of the evidence presented, including all the conduct and statements of the other alleged participants and all the circumstances of the case.*

(Gov.Inst. 18, R. at 35.) Defendants argue that the italicized portion of this instruction allowed the jury to improperly consider all of the conduct of all the participants, including conduct and statements that did not reflect on Defendants' actions or statements, in deciding whether Defendants joined the conspiracy.

Defendants' position is at odds with the plain language of the instruction which told the jury merely that it could consider the conduct of all the participants in deciding what Defendants' conduct was. Except for the italicized portion, the instruction was verbatim from the FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 5.11 (1990). The italicized portion reflected our criticism of that instruction stated in *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir.1990) *cert. denied*, 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). In *Ortiz*, we noted that a natural reading of § 5.11 would lead the jury to believe that it could only consider direct evidence of the defendant's acts, or statements made directly by the defendant, in determining what his acts or words were. *Id.* at 632. We determined that this was not an accurate statement of the law and that the jury could use the statements of other co-conspirators to determine what the defendant did or said indicating his intention to join the conspiracy. *Id.* at 634.

■ Here, the challenged instruction goes a step beyond *Ortiz* by informing the jury that it may consider, not only the statements of co-conspirators, but also their acts and the circumstances of the case. In short, the instruction advised the jury that they could use circumstantial evidence to deduce what Defendants' actions were. This is an accurate statement of the law. *See United States v. Byerley*, 999 F.2d 231, 234 (7th Cir.1993) (noting that an individual's participation can be proven by circumstantial evidence). We find no error with the instruction.

### D. *Use of a Firearm in Relation to a Drug Trafficking Offense*

Armed with a gun, Defendants pushed their way into Harris's home, beat him, held

the gun to his head, and threatened the lives of him and his children, all in an attempt to rob him of the contents of his safe. The safe contained 676.6 grams of cocaine, and 15.6 grams of crack. On appeal, Defendants contend that they were wrongfully convicted of using a gun in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).

Defendants assert that there was no evidence that they knew the safe contained sufficient amounts of cocaine to support the inference of an intent to distribute. Consequently, they contend, the gun was not used in relation to a drug trafficking offense. Subsumed within this argument is a challenge to their conviction on Count II; attempt to possess cocaine with the intent to distribute in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B).

A conviction under 18 U.S.C. § 924(c) requires proof that the defendant possessed a firearm while engaging in a drug trafficking offense and that the firearm had "some purpose or effect with respect to the drug trafficking crime." *Smith v. United States*, —— U.S. ——, ——, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993). If the use of a gun in any way facilitates the commission of the underlying offense, then the defendant has violated the statute. *United States v. Billops*, 43 F.3d 281, 286 (7th Cir.1994) *cert. denied*, —— U.S. ——, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995). In the case at bar, a jury convicted Defendants of attempting to possess cocaine with the intent to distribute it. The jury was persuaded that Defendants knew that there was a substantial amount of cocaine in Harris's safe. There was clearly enough evidence to support the jury's verdict.

Once again, we will not recount all of the facts which assemble to support the jury's conclusion because they have been adequately discussed above. We merely address a few items of evidence that pointedly show that Defendants' contention is meritless. First, Defendants note that Carl Bell ("Bell") testified that the amount of cocaine he helped

Harris place in small bags could have been sold in a day or an hour. Defendants also assert that the drugs were placed into the safe two or three days before the robbery attempt. Thus, they deduce, that it is quite possible that Harris could have sold the cocaine before the robbery attempt. This may have been a logical deduction, however, the verdict reveals that the jury did not believe that Defendants engaged in such an analytical exercise before attempting to rob Harris.

A closer look at the testimony lends further support for the verdict. Bell's testimony was that the amount of cocaine he helped Harris bag could be sold on the east side of Springfield in a day, and that it would not be impossible to sell that amount of cocaine in an hour. His testimony was not that Harris generally sold that quantity of cocaine every day or every hour. Furthermore, Harris's testimony shows that he and Dorothy brought the cocaine up from Chicago the day before the attempted robbery, not two or three days before.[6] Thus, there had not been a great deal of time for Harris to sell the drugs, and a rational jury could have presumed that Defendants believed that all or most of the cocaine was still in Harris's safe.[7]

In addition, Hill's tape-recorded conversation with Barber betrays Hill's belief that the safe contained thirty-nine ounces of cocaine. In that conversation, Hill stated:

> Man he had thirty-nine O's [ounces], about fifteen thousand [dollars], I don't know how much jewelry. We had that all in our possession and we let this little nigger. Well we didn't let them, they stayed right next to a police, right?

(Gov.Ex. 1, p. 3) Defendants contend that Hill was speaking about what the police found when they opened the safe, as opposed to what he believed was in it at the time of the attempted robbery. This argument is completely undercut by Hill's statement later in the conversation that the police found

---

6. Bell testified that he helped Harris bag the cocaine on December 7, 1991. Clearly, the jury could credit Harris' testimony over Bell's.

7. This is not to assume that the jury would have considered two days a sufficient amount of time to sell most or all of the cocaine.

nothing in the safe when it was opened. (Gov.Ex. 1, p. 5.)[8]

The facts presented at trial were more than sufficient for a rational jury to conclude that Defendants believed that the safe contained a significant quantity of cocaine; enough cocaine to give rise to the inference that Defendants' purpose in obtaining it was so that they could sell it to others. *See United States v. Smith,* 34 F.3d 514, 523 (7th Cir.1994) (holding possession of one kilogram was enough to support inference of intent to distribute); *United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). The gun was used as an integral part of their attempt to possess the cocaine. Hill held it to Harris's head and Stephenson threatened to let Hill shoot him if he did not open the safe.[9] Therefore, the gun facilitated their attempt to possess the cocaine, and Defendants' convictions must stand.

### E. *Defendants' Accountability for 63.75 Kilograms of Cocaine*

At the sentencing hearing on June 6, 1994, the district court, over defense objection, adopted the position of the Probation Office and the government and held Hill, Tate, and Stephenson accountable for 63.75 kilograms of cocaine. Defendants renew their challenge to this finding on appeal.

■ We review a district court's factual determination regarding the amount of drugs involved in a conspiracy for clear error. *United States v. Garrett,* 45 F.3d 1135, 1141 (7th Cir.1995); *United States v. Ferguson,* 35 F.3d 327, 333 (7th Cir.1994). A finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* Each member of a conspiracy is accountable for the amount of cocaine with which he was directly involved, and for amounts involved in transactions that were reasonably foreseeable. U.S.S.G. § 1b1.3(a)(1)(B); *Garrett,* 45 F.3d at 1141; *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). In determining the amount of drugs attributable to each defendant, the court may consider relevant conduct which was part of the charged offense but was not included in the indictment. *Goines,* 988 F.2d at 775.

■ So long as the facts presented in the presentence report ("PSR") bear sufficient indicia of reliability to support their probable accuracy, the court may take them into account in passing sentence. *United States v. Coonce,* 961 F.2d 1268, 1279 (7th Cir.1992). The defendant has the burden of presenting some evidence beyond mere denial calling such facts presented in the PSR into question. Once the defendant has met his burden of production, the government bears the ultimate burden of persuasion in convincing the court that the facts presented are true. *United States v. Rutledge,* 40 F.3d 879, 886 (7th Cir.1994).

■ The facts presented in the PSR were not merely bald assertions of criminal conduct made by the Probation Office. Beyond the facts presented at trial, there were numerous exhibits, including reports of law enforcement personal detailing meetings with confidential informants and trial witnesses. In addition, some of the facts presented in the PSR were supported by the Grand Jury testimony of Barber. Thus, the facts presented bore sufficient indicia of reliability to justify the district court's reliance upon them. Defendants did not carry their burden of bringing forth evidence beyond their mere denial challenging those facts.

---

**8.** Defendants point to this part of the conversation as additional proof that Hill did not believe the safe contained thirty-nine ounces of cocaine at the time of the attempted robbery. This absolutely contradicts their argument posited in the preceding paragraph that when Hill mentioned the "thirty-nine O's" he was referring to what the police had found, not what he and his cohorts believed was in the safe at the time.

**9.** As co-conspirators, Tate and Stephenson are also liable for Hill's use of the firearm in furtherance of the conspiracy. *United States v. Gutierrez,* 978 F.2d 1463, 1470 (7th Cir.1992); *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

The PSR and the facts presented at trial supported the government's position that Defendants were members of King's inner circle, and that they were integral parts of the conspiratorial scheme whose participation was a significant factor in the success of the operation. As part of the inner circle, the amount of drugs distributed by the conspiracy was foreseeable to Defendants, and the district court's finding that they were responsible for 63.75 kilograms of cocaine was not clearly erroneous.

### F. *Downward Adjustment*

█ Defendants' last contention on appeal is that the district court erred by denying them a downward departure for their mitigating roles in the offense. United States Sentencing Guidelines Section 3B1.2(b) provides that the district court should decrease a defendant's offense level if he "was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). This section should be applied to defendants who are substantially less culpable than the average participant. *United States v. Pitz*, 2 F.3d 723, 733 (7th Cir.1993) *cert. denied*, — U.S. ——, 114 S.Ct. 2141, 128 L.Ed.2d 869 (1994); *United States v. Osborne*, 931 F.2d 1139, 1157 (7th Cir.1991). We review the district court's findings regarding a defendant's role in the offense for clear error. *United States v. Maggi*, 44 F.3d 478, 482 (7th Cir.1995).

In *Osborne*, 931 F.2d 1139 we upheld the district court's denial of a downward adjustment under Section 3B1.2(b) where the defendant was merely a courier in the operation. Quoting the Court of Appeals for the Tenth Circuit, we stated:

> A drug smuggling operation has many participants; some may purchase, some may transport, some may distribute, and some may sell. All are indispensable to the operation. It would be unproductive to debate which function is more culpable. It is for this reason the Commentary directs us to focus upon the defendant's knowledge and the activities of others.

*Id.* at 1158 (quoting *United States v. Calderon–Porras*, 911 F.2d 421, 423–24 (10th Cir. 1990); *see also Pitz*, 2 F.3d at 733). We noted that while the defendant may have been less culpable than the supplier of the organization, his contribution was nonetheless integral to the operation. *Osborne*, 931 F.2d at 1159.

█ Defendants' contention that the district court erred by comparing culpability between the three of them as opposed to comparing it to others in the organization is meritless. The district court need not articulate its comparison on a person by person basis with each member of the conspiracy. The district court did, however, accept the Probation Office's position that Defendants should not get an upward adjustment for taking a leadership role in the conspiracy. Furthermore, as key actors in the conspiracy, it was appropriate for the district court to compare the culpability of each defendant against the other two.

Defendants' contention that the district court erroneously refused the downward adjustment because of the amount of drugs involved, *see United States v. Webster*, 996 F.2d 209, 212 n. 5 (9th Cir.1993), is also baseless. The district court expressly found that each defendant was an integral member of the King conspiracy. The evidence showed that they all sold drugs for King. The PSR indicates, and Defendants admit, (Reply Br. at 20), that all three acted as King's bodyguards and ran various errands for him. Tate delivered cocaine and picked up money for King. Hill delivered and Stephenson stored cocaine for King. Hill also accompanied King on trips to Chicago to pick up large quantities of cocaine. All three defendants attempted to rob a rival drug dealer in furtherance of the King conspiracy. These functions which Defendants performed were vital to the continuing success of the enterprise and gave Defendants intimate knowledge of its inner workings. Therefore, the district court's denial of a downward adjustment for being minor participants was not clearly erroneous.

For the foregoing reasons, Defendants convictions and sentences are affirmed.