In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-4026

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID W. HARRIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06-CR-164-RTR-1—**Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 9, 2009—DECIDED OCTOBER 30, 2009

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge*. David Harris appeals his conviction for possession of cocaine with intent to distribute. Harris challenges the district court's decision to admit testimony against him under Fed. R. Evid. 801(d)(2)(E). He then argues that the principal witness for the prosecution was not credible; that the evidence appropriately presented at trial only established his proximity to the drugs, not his actual possession of them; and that said evidence was therefore insufficient to sustain a conviction.

For the following reasons, we affirm the conviction.

## I. Background

Marc Cannon and Corey Anderson have worked together as drug dealers in Milwaukee, Wisconsin, for fifteen years. During the tail end of this period, Anderson also worked as a confidential informant (CI) for the Milwaukee police. David Harris, the defendant-appellant, is Marc Cannon's cousin. Harris was arrested and convicted of cocaine possession after Milwaukee police discovered a kilogram of cocaine in a green Ford Excursion sport-utility vehicle he drove from his home in Arkansas.

At trial, the prosecution's case depended primarily on Anderson's testimony. Anderson testified that during the spring and early summer of 2006, Cannon told Anderson that his cousin was coming to Milwaukee with a significant amount of cocaine. Harris arrived in Milwaukee sometime around June 25, 2006. That same evening, Cannon called Anderson and told him that his cousin had arrived. Anderson went to Cannon's residence on North 39th Street in Milwaukee (one of two residences that Cannon maintained) and met with Cannon and Harris. There, Anderson claimed to have seen some of the two kilograms of cocaine that Harris had brought with him from Arkansas. When Anderson asked Harris how much he was charging for four-and-a-half ounces of cocaine, Harris allegedly replied that "he was gonna let Marc take care of all of that." Anderson claimed that if he and Harris had successfully moved those two kilograms, Cannon would bring more in the future—an arrangement that would mark a significant step-up in their enterprise.

After meeting with Cannon and Harris, Anderson called Detective Jasemin Pasho, a member of the Milwaukee Police Department's gang intelligence unit. Anderson had previously both provided Pasho with information on a homicide investigation and a marijuana trafficking investigation and arranged controlled purchases of cocaine for her. Anderson told Pasho about what he had seen and heard at Cannon's house. Specifically, Anderson explained that Cannon and an individual from Arkansas (although he had met with him, Anderson did not know Harris's name at that time) were traveling in a green Ford Excursion with Arkansas plates and were trying to sell a substantial amount of cocaine. Anderson told Pasho that he *believed* the cocaine was concealed in the Excursion, though Pasho later testified that Anderson did not claim that he had actually *seen* the cocaine in the Excursion. He also told her that Cannon and Harris had asked him whether he could take some of the cocaine.

Pasho called another officer from the gang intelligence unit and told him to go to Cannon's residence on North 39th Street and to look for the Ford Excusion. When the police arrived, the Excursion was not there. Pasho then called Anderson, who told her that Cannon also had another residence in the 6500 block of Coldspring Road and that this was his primary residence. Pasho called other officers in her unit and gave them the information about the house on Coldspring Road and the green Ford Excursion, describing it as a vehicle with dark-tinted windows and no front license plate.

Members of the gang intelligence unit located the Ford Excursion at the Coldspring Road house and set up surveillance. A short time later, the officers stopped the Excursion when they observed Cannon and Harris driving away from the residence. Officers found $8,900 in cash in Harris's pockets and a full brick of cocaine contained in the rear bench seat of the truck. A search of Cannon's house on June 27, 2006 turned up additional cocaine hidden in the basement rafters.

Harris was indicted for possession with intent to distribute 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B). Harris then filed several pretrial motions, including a motion to suppress the evidence seized during the traffic stop of the Excursion. A magistrate judge held an evidentiary hearing on Harris's suppression motion and issued a report recommending that the district court deny the motion. The district court adopted that recommendation in an order on February 13, 2007. On September 13, 2007, Harris moved to re-open the suppression issue; the magistrate recommended that the district court deny the motion, and the district court subsequently adopted that recommendation.

The grand jury returned a superceding indictment on June 17, 2008, adding a count of conspiracy to distribute more than five kilograms of cocaine. At trial, the government hoped to present the testimony of Marc Cannon, but informed the court at sidebar before opening statements that Cannon had invoked his Fifth Amendment privilege against self-incrimination with respect to his

proposed testimony against Harris. Thus, the principal witnesses against Harris were Corey Anderson and the law enforcement team that made the arrest. After a two-day trial, the jury convicted Harris of the charge of possession with intent to distribute but acquitted him on the conspiracy charge. The district court sentenced Harris to 120 months' imprisonment and eight years of supervised release. This appeal followed.

## II. Discussion

A. Corey Anderson's Testimony

Harris first objects to the district court's decision to admit certain portions of Corey Anderson's testimony under the exception to the hearsay rule for co-conspirator's declarations. This testimony was mostly hearsay statements by Marc Cannon, such as when Cannon said that "one of his cousins was coming up from down south. Supposed to be bringing some [cocaine] up here;" "[Cannon's] cousin supposed to come down. He supposed to have a couple [kilograms of cocaine];" and that "his [Cannon's] cousin was coming down here with some work [some cocaine]."

We review a district court's decision to admit hearsay statements under the co-conspirator's exception for abuse of discretion. *United States v. Prieto*, 549 F.3d 513, 523 (7th Cir. 2008). "In order for a statement made by a member of a conspiracy to be admissible against other members of the conspiracy under Rule 801(d)(2)(E), the government must prove by a preponderance of the evi-

dence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008). This Circuit requires that a district court make a ruling on the admissibility of a co-conspirator's statement prior to their introduction at trial. *United States v. Santiago*, 582 F.2d 1128, 1130-35 (7th Cir. 1978). However, a failure to make the required findings does not necessarily doom the district court's decision to admit the testimony. "[A] district court's failure to make *Santiago* findings will not be reversible error so long as the evidence in the trial record would support such findings." *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995).

Harris has a two-part qualm with the district court's decision to admit Anderson's statements. He first argues that this court should overrule *Stephenson* and adopt a procedure similar to that used in the Sixth and Tenth Circuits. In those circuits, an appeals court reviewing a district court's decision to admit statements pursuant to Rule 801(d)(2)(E) first assumes that the evidence is inadmissible and then determines whether the decision to admit it was harmless error beyond a reasonable doubt. *See United States v. Mahar*, 801 F.2d 1477, 1503-04 (6th Cir. 1986); *United States v. Radeker*, 664 F.2d 242 (10th Cir. 1981). As the government points out, both circuits are flexible about implementing this test and have held that where the record demonstrates that the court must have made the formal inquiry, even with no findings on the record, there is no reversible error. *See United States v.*

*Martinez*, 430 F.3d 317 (6th Cir. 2005); *United States v. Sinclair*, 109 F.3d 1527, 1533-35 (10th Cir. 1997). This observation, when combined with our need to follow extensive precedent (*Stephenson* itself relied on prior Seventh Circuit cases that reached the same conclusion, *see, e.g., United States v. Nicosia*, 638 F.2d 970, 974 (7th Cir. 1980)), proves fatal for the appellant's first point. The district court should have made an explicit finding on the record with respect to the admissibility of the contested statements under Rule 801(d)(2)(E), but its neglect to do so does not rise to the level of a reversible error.

Harris next argues that there is not enough evidence in the record for the hearsay statements to pass muster under the rule in *Stephenson*. When considering the admissibility of hearsay statements under Rule 801(d)(2)(E), a district court is allowed to consider the statements themselves as evidence of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 180 (1987) ("We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."). Notably, *Bourjaily* did not go so far as to hold that the statements alone could be sufficient to demonstrate a conspiracy and the defendant-declarant's participation therein without independent supporting evidence in the record. *Id.* at 181. That is, the record must contain at least some facts confirming the existence of the conspiracy and Harris's participation in it before we could find the disputed portions of Anderson's testimony admissible under Rule 801(d)(2)(E).

In terms of independent evidence, the government argues that the existence of a drug-trafficking conspiracy can be inferred from: (1) the one-kilogram brick of cocaine found in the Ford Excursion that Cannon was driving with Harris in the passenger seat; and (2) the fact that Harris had $8,900 in cash in his pockets, an amount the government claims is approximately equal to the value of about 500 grams of cocaine (which, together with the cocaine taken from the Excursion and from Cannon's residence, equals about two kilograms, the amount that Anderson claimed Harris and Cannon had available for sale). Harris attempts to combat this corroborating evidence. He states that, according to the government's own witness at trial, the value of a half-kilogram of cocaine is in fact about $12,000, not $8,900, and that the mere presence of Harris in a vehicle driven by someone else and registered to a third party (Harris apparently drove the Excursion from Arkansas, but it was not registered to him) is thin evidence of a conspiracy.

The government, however, points to further indications of a conspiracy in Anderson's testimony. These include Harris's presence at Cannon's house when Anderson and Cannon discussed cocaine sales, Harris's presence when Cannon both showed Anderson cocaine that Harris supposedly brought with him and claimed that Harris could bring more cocaine in the future, and Harris's statement to Anderson that he would let Cannon take care of setting a price for cocaine. Harris presents counter-arguments against the use of each data point. He explains his presence during the conversations by pointing out that he was only in town for the weekend

and was staying with Cannon, and that his alleged willing-ness to let Cannon take care of the details was in fact a non-committal statement that did not indicate the existence of a conspiracy. In the alternative, he argues that these statements only indicate the existence of a conspiracy if one assumes that Anderson is credible. Because the district court never made an explicit credibility deter-mination on the record, Harris asks us to either remand to the district court for said determination or reverse outright under the theory that the absence of such a determination dooms the admission of the hearsay state-ments at the heart of the case. Harris further points out that the jury's decision to acquit him on the conspiracy charge signals its skepticism with respect to Anderson's testimony about a future agreement to buy and sell greater quantities of cocaine.

Both sides agree that the statements, if improperly admitted, were not harmless. Harris argues that Ander-son's testimony was central to the case against him, and the government waived any harmless error argument by not presenting one in its response brief. This presents a close question: the government's evidence of the con-spiracy centers around the disputed hearsay statements themselves (and while *Bourjaily* permits this kind of bootstrapping, it is not the strongest evidence of a con-spiracy) and Harris's presence in the Excursion when police officers discovered a kilogram of cocaine.

Nonetheless, the preponderance of the evidence on record does support the existence of a conspiracy. First, it is relevant that while Harris was not the owner of the

Excursion, he drove it from Arkansas to Milwaukee, and thus there is strong evidence that the cocaine discovered in the car belonged to him. Second, while $8900 found in Harris's pockets may not exactly equal the street value of a half-kilogram of cocaine, such an exceedingly large quantity of cash is further circumstantial evidence of Harris's involvement in drug trafficking. Third, the accuracy of some of Anderson's statements to the police—most importantly, that there was cocaine concealed in the Excursion—corroborate his testimony and adequately bolster his credibility. Finally, Harris's claim that Detective Pasho's testimony is contradictory lacks merit. Pasho testified that Anderson told her he had seen cocaine during his meeting with Cannon and Harris, and that he believed cocaine was concealed in the Excursion, even though he did not personally see it. We therefore defer to the trial court's decision to characterize Anderson's testimony as credible, conclude that a preponderance of the evidence on the record supports the existence of a conspiracy, and affirm that the district court properly admitted Anderson's testimony under Rule 801(d)(2)(E). While the district court should have determined as much pursuant to the procedure set out in *Santiago*, the absence of such explicit findings in this case is not reversible error. Since the decision to admit evidence was correct, it did not infringe on defendant-appellant's Sixth Amendment rights.

## B. The Traffic Stop of Harris's Ford Excursion

Harris's second argument is that the district court erred by admitting evidence seized during the traffic

stop of the Ford Excursion in which he was riding. Harris argues that one of the stated bases for the stop—that he was riding in a vehicle that lacked a properly displayed front license plate—is not required in Arkansas, where the car is registered. The district court nonetheless found that there was probable cause for the stop based on the information that Anderson supplied to Pasho, and that in turn the officers who actually conducted the stop had probable cause under the collective knowledge doctrine.

The collective knowledge doctrine provides that

> The police who actually make the arrest need not personally know all of the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause.

*Tangwell v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (emphasis removed) (quoting *United States v. Valencia*, 913 F.2d 378, 383 (7th Cir. 1990)). The doctrine derives from the Supreme Court's decision in *United States v. Hensley*, 469 U.S. 221 (1985), where the Court held that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* at 231 (citations omitted). We have recognized two situations where the collective

knowledge doctrine usually applies: where police departments or agencies transmit information across jurisdictions, and where officers communicate with each other at the scene of an arrest. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005).

The present case falls into the second of those two scenarios. Harris, however, argues that the police officers who actually conducted the stop did not have sufficient communication with Pasho to justify application of the collective knowledge doctrine. He relies heavily on *United States v. Ellis*, 499 F.3d 686 (7th Cir. 2007). In *Ellis*, three police officers had arrived at a home; two officers questioned one of the residents at the front door of the house, while the third officer went around to a side door. *Id.* at 688. The officer at the side door, upon hearing what he though was a person running inside the house, decided to enter. *Id.* The district court found that the police could justify the officer's warrantless entry through the side door of the house by relying on the information that the two officers at the front door learned from questioning the house's resident. *Id.* at 689-90. We reversed, holding that because there was no communication between the officers at the scene, and because the officer who entered the house conceded at the suppression hearing that he could not hear the conversation at the front door, that the collective knowledge doctrine did not apply to the case. *Id.* at 690.

Harris argues that in his case, as in *Ellis*, there was insufficient communication between Pasho and the officers at the scene to justify application of the collective

knowledge doctrine. The government counters that Pasho and the officers who conducted the stop were all members of the same police unit and that there was "extensive communication" between Pasho and the officers at the scene. The content of this communication at least included information about the Ford Excursion and the need to conduct a traffic stop. That information alone would be enough to justify application of the collective knowledge doctrine, as the officers were acting based on Pasho's request for a traffic stop rather than their own suspicions.

Harris also argues that the information that Anderson supplied to Pasho did not provide probable cause for a traffic stop. When law enforcement agents act on an informant's tip, a reviewing court examines (1) whether the informant made first-hand observations; (2) the degree of detail provided by the informant; (3) whether independent information corroborates the informant; and (4) whether the informant has proven to be reliable in past dealings with law enforcement. *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006).

Anderson had previously provided information to law enforcement as part of various investigations, and Harris does not suggest that he was unreliable in those situations. Nor does Harris challenge Anderson's first-hand observation of drugs, though he continues to assert that Anderson was inconsistent in claiming that he had seen drugs in the car. Instead, Harris argues that there was no independent corroboration of Anderson's tip, and that the information was not especially detailed.

However, the tip contained specific information about Cannon's residence, the car Harris was driving, and Anderson's interactions with both Cannon and Harris. At the very least, those details turned out to be correct. Anderson's tip also told officers that Cannon and Harris had cocaine in Harris's truck. In the "Agreed Facts" portion of his motion to suppress, Harris stipulated that "Detective Jasemin P. Miscichoski [Pasho], City of Milwaukee Police Department, reported that on Sunday June 25, 2006 at approximately 7:42 p.m. he [sic] was advised in a telephone conversation with a confidential informant that: '. . . a black male, in his late 30's was driving a Ford green Excursion displaying Arkansas registration plate, and that inside the truck there is hidden approximately 2-3 kg of cocaine.'" While Pasho (at the time named Miscichoski) did not question Anderson about whether he had actually seen cocaine in the vehicle, Anderson had seen cocaine in Cannon's residence and had seen both Cannon and Harris in the same room with cocaine, and heard Cannon claim that Harris had driven up from Arkansas with significant quantities of it. As the district court correctly determined, that information would give officers probable cause to stop and search Harris's vehicle.

C.  Sufficiency of Evidence for a Conviction

Harris's last argument renews his post-judgment motion for acquittal. A challenge to the sufficiency of the evidence is reviewed under an extremely deferential standard. We ask whether "after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt*." United States v. Curtis*, 324 F.3d 501, 504 (7th Cir. 2003) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A judgment of acquittal is only warranted if the record is entirely devoid of evidence from which a rational jury could find guilt beyond a reasonable doubt.

Harris argues that the evidence introduced by the government at trial merely established his proximity to the drugs seized from the truck, but did not establish that he knew the vehicle contained cocaine. This Circuit has previously ruled that mere proximity to an item is insufficient to establish possession. *See United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009); *United States v. Chairez*, 33 F.3d 823, 825 (7th Cir. 1994). However, the government presented evidence that a kilogram of cocaine was found in the Ford Excursion that Harris drove from Arkansas to Milwaukee, and that Harris was present when Cannon and Anderson discussed drug sales. Even without the disputed hearsay testimony from Anderson, this evidence would enable a rational jury to find Harris guilty of the possession charge on which he seeks a judgment of acquittal.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment of conviction.